## STATE

### v.

### John FERREIRA.

### No. 2009–172–C.A.

Supreme Court of Rhode Island.

June 23, 2011.

Lauren S. Zurier, Department of Attorney General, for State.

Janice M. Weisfeld, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The defendant, John Ferreira, appeals from a judgment of conviction for one count of first-degree child molestation and three counts of second-degree child molestation. On appeal, he argues that the trial justice, in denying his motion for a new trial, (1) overlooked or misconceived significant inconsistencies in the state's case; (2) wholly overlooked the context in which the complainant's allegations occurred and the possible motives for fabricating her allegations; (3) overlooked the testimony of the six defense witnesses, including the testimony of the defendant himself; and (4) erred in basing her decision, in part, on matters not in evidence. This case came before the Supreme Court pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

The disturbing facts of this case concern molestation committed against Amy,[1] a person under fourteen years of age. After her parents' divorce around the end of 1996, Amy resided primarily with her mother and her younger brother, Ben. According to defendant, Amy's mother's boyfriend, he also resided in the household since approximately 1997. Both children had frequent visitations with their father and his wife. In September 2004, when Amy was thirteen years old, she revealed to her father and stepmother that defendant had been touching her inappropriately for several months. After an investigation, defendant was charged with sexually molesting Amy.[2] The pertinent evidence adduced at trial, which took place in July 2006, is set forth below.

Amy testified that between May and June 2004, when she was twelve years old, defendant began touching and licking her breasts, vaginal area, and buttocks. She testified that defendant "would grab [her breasts] and rub them" using "[h]is hands or his lips." Amy further testified that

---

1. The names of the complaining witness and her brother are fictitious.

2. Specifically, defendant was charged with four counts of child molestation, in violation of G.L.1956 § 11–37–8.1 to § 11–37–8.4, with all counts occurring between May 1, 2004, and September 19, 2004. The counts were (1) first-degree child molestation (cunnilingus); (2) second-degree child molestation (mouth/breast contact); (3) second-degree child molestation (hand/breast contact); and (4) second-degree child molestation (hand/vagina contact).

defendant would "grab [her buttocks] and rub it," and that he would "lick [her] breasts and [her] vaginal area." According to Amy, during these incidents defendant would tell her to take her clothes off and she would abide because she was "afraid of him" and "didn't know what he would do" if she did not comply. Amy testified that she had underwear on while defendant touched her vaginal area, that defendant "rub[bed]" her vaginal area "[u]nderneath" her clothes, and that he licked it by "pull[ing the underwear] away." Amy testified that when she "would try to use [her] hand and push [defendant] away" to get him to stop, defendant would just use "his other hand to hold [Amy's] hands away."

According to Amy, these incidents happened "daily" and "dozens" of times, "mostly at nighttime," and took place in either her room, defendant's bedroom, or the basement. Amy testified that her mother "would either be sleeping or * * * at work" when these incidents occurred. She further testified that defendant stopped touching her two weeks before she ran away from home on September 19, 2004.

Amy also testified that defendant had explained to her "multiple times that he was trying to masturbate [her]," and that he had talked about the way parts of her body looked and used "dirty words to explain them." On cross-examination, Amy testified about other inappropriate incidents that occurred between her and defendant.[3] One such incident involved defendant rubbing his genitalia against

Amy's leg while they were in the pool. Amy also testified that on "at least four or five" occasions, defendant walked into the bathroom and opened the shower curtain while Amy was taking a shower, and that "around ten" times, defendant opened the bathroom door while Amy was in the bathroom and watched her pull her pants up. Amy additionally testified that defendant informed her on "multiple" occasions that he does not wear underwear, and that he told her that he had had a vasectomy and explained what it was.

During the time that defendant's odious behavior was occurring, Amy kept a diary, which was admitted at trial as a full exhibit. Amy testified on cross-examination that she began keeping the diary on June 9, 2004, and that she did so "[b]ecause [she] had no one else to talk to." Amy further testified that she did not write down everything that happened to her "[b]ecause if anyone had found [the diary, she] would have not known what would have happened." She also testified that she did not write daily because she "just didn't feel like writing" every day.

On June 13, 2004, Amy made her first diary entry about defendant's inappropriate touching,[4] when she wrote the following: "[Defendant] is very strange. He touches me, like my boobs and 'privates.' I hate it. He said I could choose, I said not to be touche[d], but it seems he can't help it." On June 21, 2004, Amy made the following entry:

"Dear Diary,

---

**3.** The defendant's attorney questioned Amy about these incidents using a three-page document that Amy drafted before her interview with a Forensic Interview Specialist from the Children's Advocacy Center. The document listed inappropriate behavior by defendant. It was marked for identification, but not submitted as a full exhibit.

**4.** Not all of Amy's entries contain allegations against defendant; many of them concern Amy's school life, her interest in a boy, and her complaints about punishment at her mother's house. One entry reads: "Not much has happened worth writing about * * *. [L]ately my life is just plain *blah* here at my mom's house."

"Today, school was fun. But the big news is well, we were fooling around with John and me & [Ben] were hit[t]ing [J]ohn with a slipper. And at 8:05 I hit him with a towel and he came after me not as a joke. [Ben] threw his slipper & John took mom's homemade weight and took the pole and hit [Ben] to the point he started crying. [Ben] cried and John flipped out. I feel like my heart is torn into millions of pieces when [Ben] cries. He want[s] to live at daddy's, now I don't blame him. He always gets in trouble and we are always in bed. Today our bedtime was 10pm it ended up being 8:12pm. I didn't do anything, but now I can't trust him. I [h]ate him. G2G! Bye!" [5]

An August 7, 2004 entry reads in part:

"[T]oday my brother peed outside and got sent to bed all day. I brought him food in case he could get out for supper and 10 minutes ago (12:20 AM) I found a note. * * * I cr[i]ed. I don't know what to do. Please help me decide. G2G! Bye."

According to Amy, the referenced note was left in her room by Ben; it indicated that Ben wanted to live with their father.

Amy also testified that their mother abused Ben and that Ben wanted to live with their father. When asked about which parent with whom she wanted to reside, Amy gave conflicting testimony. However, on cross-examination, Amy admitted that she "hated" defendant because he disciplined her and punished her even when she did not "do[ ] anything wrong."

Amy also testified that she "report[ed]" to her father about how her mother abused Ben and about how "mean" her mother and defendant were.

On September 19, 2004, Amy and Ben ran away from home. Amy testified that she ran away "[p]artially" because of what had been going on between her and defendant, as well as because she did not want Ben to continue to be punished and physically abused. After running away, the children called their father, who picked them up that evening.[6]

A couple of days later, while Amy and Ben were on their way to a clothing store with their father and stepmother, the stepmother asked Amy whether "anything happened" between her and defendant. The stepmother testified that she asked Amy this question because Amy was always close to her mother "and for her to run away [seemed] very odd" and did not "add up." Amy responded "[y]es" and, while in the store, took her stepmother aside and explained to her in detail how defendant "had touched and licked [her] body where he shouldn't have."[7]

On September 23, 2004, four days after she ran away, Amy made an entry in her diary, which reads in pertinent part:

"Sorry diary I haven't talked to you [i]n over a month! I ran away from home. I am at my dad's and stepmom's house. From now on I am willingly calling her mom. Well anyway today [i]n less than 2 hours I will talk to someone about what John did. [Step-

---

5. It is our understanding that "G2G" is a slang acronym for "got to go."

6. Both Amy and Ben have been residing with their father and stepmother since they ran away.

7. Amy testified that this was the first time she ever told anyone about the molestations. She also testified that she never told her mother about defendant's behavior because she was afraid that her mother would not have believed her and would have told defendant, or that her mother "wouldn't have done anything" and Amy "would have gotten * * * in trouble from her too."

mother] knew something was wrong, because she asked 2 days ago if John touched me anywhere [i]nappropriate and I trust her and my dad, too. So I told them everything, about what went on. She said she was going to throw up. I can't wait to tell that person today. My dad said he would do anything so I didn't have to go back there. I love [stepmother] & my dad. They love me, too. You can tell. If the judge says I have to go back I will get the shit beat out of me, I lay money on it, and I'll just run away *again*. I will not go back ever you can quote me. I [am] pretty sure [Ben] would say the same thing he hates it there, too. But [a]ll I have to add is that I still love my mom but I can't stand the way she acts, and I can't stand John. o[b]viously you know why. G2G! Oh wait! I read what I told you in the past and I still feel hatred toward that pervert pig of a boyfriend John is for my mom.

"Did I tell you John is either 58–59. That's nasty. He's a pig. If anyone at school found out I would be a laughing stock of the whole school! Well G2G! I'm at [a friend's house] I have to finish my homework. And I am going to let the person that I talk to read this. I hope it's ok. Bye!

"Later that day: Well [stepmother] just picked me and [Ben] up. I am not going to see that person today."

Amy testified that she did not make this diary entry "in preparation" for speaking with law enforcement personnel about defendant, but she admitted that the "person" she was referring to in her entry was "affiliated with law enforcement." Amy also testified that no one told her to write down what she recalled, and that she made this entry on her own accord.

On September 28, 2004, nine days after she ran away, Amy made one last entry in her diary. She wrote the following:

"Dear Diary,

"I'm sorry I have to say this but I left some big details out about the whole John issue. Such as he opens the shower curtain while I'm in there. He had touched me in the pool and I felt his you know what on my leg. He also used to talk dirty. And he would call my private a pussy. That's nasty. But anyway when I told him to stop touching he wouldn't. When I told him to stop touching altogether he said OK then started touching the next day. When I seriously told him to stop he did, but I would be punished for every little thing, by John and Mommy. She is taking all the traits from him, except the perverted side. G2G! Oh, I have to give this diary to the police so I won't write for a while again. Bye!

"Later that morning[.]

"Dear Diary,

"I was scar[]ed at first but when I stood up to John, I FELT RELIEF, then he started punishing me, although now I know he was trying to change my mind so he could touch. Now he didn't get his way. I got my way. [Ben] and I got to live with daddy our dreams are coming true one at a time. I couldn't be happier, well actually I could but that's besides the point, lol! Well I'm on my way to school so I will see you after the cops report you as evidence. You are my proof. My savior. G2G! Bye!"

Amy testified that she composed this entry by herself, with no help from anyone else.

Meanwhile, on September 24, 2004, Amy's father filed, with the Coventry Police Department, a child molestation complaint against defendant.[8] On September

---

**8.** On cross-examination, Amy's father admit- ted that there were "a lot of problems" be-

27, 2004, the case was assigned to Detective Joseph Sullivan. The same day, while speaking with Det. Sullivan, the father mentioned that Amy had been keeping a diary. Detective Sullivan asked him to retrieve the diary, and the father turned it over to the detective the next day.

Detective Sullivan arranged for Amy to be interviewed by a Forensic Interview Specialist from the Children's Advocacy Center (CAC). The interview took place on October 13, 2004, and was observed through a one-way mirror by officials from the police department, including Det. Sullivan, the Attorney General's office, and the Department of Children, Youth and Families (DCYF). Detective Sullivan made an entry about this interview in a narrative.[9] His entry included the following excerpt, which defendant's counsel read into the record:

> "While on the bed [Amy] said her pants came off, but her underwear stayed on. At that point [Amy] said [defendant] kissed her on the lips, and he rubbed her underneath. When [Amy] was asked how many times did [defendant] put his lips on her private areas, she said about 10 times. [Amy] said [defendant] would suck on the outside of her bottom private with his lips and his tongue."

On cross-examination, Amy confirmed that this portion of Det. Sullivan's entry was accurate, but she clarified that when defendant kissed her private areas, her underwear stayed on, but that defendant "pull[ed] it] off to the side." After the

CAC interview, defendant became a police suspect.

Amy testified that the last time she spoke with defendant was on October 15, 2004, when, in the presence of Det. Sullivan and another detective, she placed a controlled telephone call to defendant. A tape recording of the controlled call was played for the jury and admitted at trial as a full exhibit.[10] A transcript of the call was given to the jury while the tape recording was played in court, but it was not admitted as a full exhibit. The call was transcribed as follows:

> "**Det. Joseph Sullivan:** The date is October 15, 2004 the time is 07:35 hours. * * * I'm having [Amy] place[ ] a control[led] call to John Ferreira * * *.
> " * * * *
> "**John Ferreira:** Hello.
> "**[Amy]:** Hi John.
> "**John Ferreira:** Yeah.
> "**[Amy]:** It's me, hmm.
> "**John Ferreira:** Yeah, How've been?
> "**[Amy]:** Good, hmm.
> "**[Amy]:** Hmm I am having a good time here. Hmm, well you know there is a court date coming up and I'm thinking about coming home. Hmm, I told my dad that you were mean, but I didn't tell him anything else and before I wanted to come home, I wanted to be sure that you'll stop touching my private areas.
> "**John Ferreira:** Sure, I did stop when you . . .
> "**[Amy]:** Well, I know it's wrong and hmm . . .

tween him and his ex-wife, both during the divorce proceedings and afterwards, some of which involved Amy and Ben.

9. As part of his investigation of the case, Det. Sullivan generated a document referred to as a "narrative," which he updated as the case progressed. Detective Sullivan's narrative was marked for identification, and parts of it

were read into the record by defendant's counsel.

10. Detective Sullivan testified that he was present during the controlled call and that the tape recording was "a true and accurate copy of that controlled call."

"**John Ferreira:** Where are you calling from?

"**[Amy]:** Home.

"**John Ferreira:** Who's there?

"**[Amy]:** No one. Inaudible.

"**John Ferreira:** How are you getting to school?

"**[Amy]:** What?

"**John Ferreira:** How are you getting to school?

"**[Amy]:** Hmm, daddy's outside warming the truck.

"**[Amy]:** Well, I didn't like when you talked dirty and everything and hmm when I'm in the bathroom I want to be by myself and I think it's wrong that you touched and kissed me and everything and I want to be in my room at night with the door closed and I have a decision and I want to hear you say that you'll stop or I will have to go tell someone at school.

"**John Ferreira:** I will stop.

"**[Amy]:** K, well I gotta go, cause I'm gonna * * * be late.

"**John Ferreira:** Ok.

"**[Amy]:** Bye.

"**John Ferreira:** Bye."

The defendant testified at trial in his own defense. First, he testified about his awareness of some of the problems that existed between Amy's parents during and after their divorce. The defendant recounted two specific instances when her father filed complaints against her mother with DCYF, which contained allegations that later were deemed to be unfounded.

When questioned about Amy's allegations against him, defendant denied opening the shower curtain while Amy was in the shower,[11] opening the bathroom door

and watching Amy pull her pants up, telling her that he does not wear underwear, or using explicit language with her. The defendant also explicitly denied touching Amy's breasts and vaginal area. He admitted that he touched Amy's buttocks while playing around with her, but denied ever doing so in a sexual manner. The defendant also admitted to hitting Ben with a stick.

The defendant further testified that prior to Amy running away from home in September 2004, she "had been getting in trouble for * * * quite a while for lying." According to defendant, Amy ran away because "[s]he got the riot act read to her [by her mother], she lost phone rights for a week, she lost friends at the house for a week, and she got an eight o'clock bed time until further notice."

Finally, defendant testified that around "[l]ate July, August," Amy began using the term "private parts" to refer to all her body parts, often in the context of rough horseplay between Amy, Ben, and defendant. Thus, he testified, during the controlled call, when Amy asked defendant to "stop touching [her] private areas," he thought that she was referring to rough horseplay and not to sexual touching.

The defense called Officer David Fraatz, a patrolman for the Coventry Police Department, to testify. Officer Fraatz testified that after Amy's father "responded" to the police department, the officer "t[ook] the initial report" and then drafted a narrative about the case against defendant, based on information received from the father and on "a small amount of follow-up." The defendant's counsel read the following part of Officer Fraatz's narrative into evidence: "[Amy] had stated that re-

---

11. The defendant testified that on one occasion, he did use the bathroom while Amy was taking a shower, but that he did so with both her and her mother's permissions. The defendant insisted that he never opened the shower curtain while Amy was in the shower.

cently [defendant] began performing oral sex on her vaginal area and breasts. [Amy's father] stated that [Amy] had recently been asked by [defendant] to perform oral sex on him."[12] Officer Fraatz testified that this part of his narrative was a fair and accurate representation of the information given to him by Amy's father.

Also testifying for defendant was Amy's mother. She testified about the acrimonious nature of her divorce, alleging that at one point, Amy's father got "really mad" at her and told her that he would "ruin [her] life" no matter "how long it t[ook] and what [he] ha[d] to do." She also testified that the father filed four DCYF complaints against her between 1998 and 1999, and that all of the allegations contained in the complaints were deemed to be unfounded by DCYF. She further testified that when Amy started junior high school, her behavior "progressively got worse." According to the mother, Amy became more "argumentative" and "brutal to her brother," and she also started lying.[13] She further testified that Amy used the term "private parts" to refer to any of her body parts.[14] Finally, the mother testified that she did not believe her daughter's accusations against defendant and thought that she was lying.

The defense called Amy's cousin to testify. The cousin described her relationship with Amy, prior to Amy running away, as "close." She also testified that Amy never spoke to her "about anything unusual * * * going on in her life," and that she perceived Amy's relationship with defendant to be "almost like daughterly." The cousin further testified that she has a "fairly close relationship" with defendant and considers him "to be almost like an uncle to [her]."

The final witness who testified for defendant was his former business associate. The associate testified that in his opinion, defendant has a reputation for being an honest individual. The associate based his opinion on his personal dealings with defendant back in the 1970s and 1980s, as well as on his conversations with other individuals familiar with defendant.

On July 14, 2006, the jury found defendant guilty of one count of first-degree child molestation (cunnilingus); one count of second-degree child molestation (mouth/breast contact); one count of second-degree child molestation (hand/breast contact); and one count of second-degree child molestation (hand/vagina contact). The jury found that these molestations occurred between May 1, 2004, and September 19, 2004.

On July 27, 2006, a hearing was held on defendant's motion for a new trial.[15] In a written decision issued on November 3, 2006, the trial justice denied defendant's motion.[16] In her decision, the trial justice first cited to "relevant portions of [Amy's] testimony," in which Amy described how defendant used his mouth to lick her

---

**12.** Amy testified on cross-examination that defendant never asked her to touch his penis or to perform oral sex on him.

**13.** Amy's maternal aunt similarly testified that Amy's behavior progressively got worse in the period of time leading up to her running away.

**14.** Amy's maternal aunt testified to the same.

**15.** Although the docket contains an entry for July 21, 2006, which reads "Motion for New

Trial," the record does not contain any such motion papers filed by defendant.

**16.** The record contains a copy of the trial justice's written decision, and a docket entry for November 3, 2006, states "Motion for New Trial"; however, neither the record nor the docket reveal the entry of any order reflecting the trial justice's denial of defendant's motion for a new trial.

breasts and vaginal area, and in which she twice repeated that she had underwear on, but that defendant would pull it off to the side. The trial justice also referred to the following portion of Det. Sullivan's narrative that described Amy's interview with the CAC worker: "[Amy] said her pants came off, but her underwear stayed on. * * * [Amy] said [defendant] would suck on the outside of her bottom private with his lips and his tongue." Detective Sullivan's narrative was not entered as a full exhibit, but portions of it, including the portion referenced by the trial justice, were read into the record by defendant's counsel.

In her decision, the trial justice also referred to a DCYF intake report and quoted portions of that report. Specifically, the trial justice noted that the report indicated that Amy's father initiated contact with DCYF and informed the department that Amy revealed to him and his wife "that [defendant] had 'touched her in a very dirty way' . . . later revealing that he had performed oral sex on her breasts and vaginal area and that she had been asked by [defendant] to perform oral on him." The trial justice also referred to another part of the DCYF report that described Amy's CAC interview. The report indicated that during the interview, Amy stated that defendant "would use his lips and his tongue and suck down there and do circles with his tongue." Finally, the trial justice referred to yet another portion of the DCYF report, in which Marvin Wasser, M.D., a physician who examined Amy, reported that Amy told him "that many times during the past 6 months she was touched on/in vagina by fingers and mouth of male friend of her mother at their house at night." The justice also noted that according to Dr. Wasser, Amy was "[n]ever contacted with penis and never participated in any sexual contact towards the man." The justice noted that

this last statement was "[c]onsistent with [Amy's] trial testimony."

The trial justice concluded that "a review of the entire record of this case, including prior statements of the victim, reveals a profusion of credible and consonant evidence to support beyond a reasonable doubt the jury's finding of guilt upon the four counts of the indictment." After finding "no grounds to support the granting of a new trial," the trial justice denied defendant's motion.

The trial justice sentenced defendant to thirty years on the first-degree child-molestation count, with eighteen years to serve and twelve years suspended, with probation, and to twenty years on each of the second-degree child-molestation counts, with ten years to serve and ten years suspended, with probation, with all sentences to run concurrently. The defendant appealed.

## II

### Standard of Review

When ruling on a motion for a new trial, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Prout*, 996 A.2d 641, 645 (R.I.2010) (quoting *State v. Bergevine*, 942 A.2d 974, 981 (R.I.2008)). "[T]he trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *Id.* (quoting *State v. Cerda*, 957 A.2d 382, 385 (R.I.2008)); *see also State v. Guerra*, 12 A.3d 759, 765 (R.I.2011). The trial justice must deny the motion for a new trial "[i]f 'the trial justice agrees with the jury's verdict or if the evidence is such

that reasonable minds could differ as to the outcome.'" *Prout,* 996 A.2d at 645 (quoting *Cerda,* 957 A.2d at 385). However, if the trial justice does not agree with the jury's verdict, he or she must "embark on a fourth analytical step." *Guerra,* 12 A.3d at 765. This step requires the trial justice to "determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." *Id.* at 765–66 (quoting *State v. Rivera,* 839 A.2d 497, 503 (R.I.2003)). "If the verdict meets this standard, then a new trial may be granted." *Id.* at 766 (quoting *Rivera,* 839 A.2d at 503).

■■ "This Court's review of a trial justice's decision on a motion for a new trial is deferential." *Prout,* 996 A.2d at 645. This is because a trial justice is "present during all phases of the trial, [and] is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Guerra,* 12 A.3d at 766 (quoting *State v. Texieira,* 944 A.2d 132, 141 (R.I.2008)). Thus, when "the trial justice has articulated a sufficient rationale for denying a motion for a new trial, the decision will be given great weight" and we will disturb it only if the trial justice "has overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong." *State v. Banach,* 648 A.2d 1363, 1367 (R.I. 1994).

## III

## Discussion

On appeal, defendant argues that the trial justice erred in denying his motion for a new trial. In particular, he asserts "that the trial justice either overlooked or misconceived the import of significant inconsistencies in the state's case." The defendant also argues that the justice "wholly overlooked the context in which these allegations were made and the complainant's motives for fabricating her claims," and that the justice "made no mention whatsoever of the testimony of any of the six defense witnesses, most important among them the testimony of the defendant himself." The defendant's final assertion is that the trial justice committed reversible error by "bas[ing] her decision, in part, * * * [on] matters which were not in evidence." We shall discuss each of defendant's arguments in more detail *seriatim.*

### A

### Inconsistencies in State's Case

■ The defendant first argues that the trial justice "overlooked or misconceived" significant inconsistencies in the state's case. He points out that Amy's in-court testimony that, during the incidents in question, she had underwear on, but that defendant "pulled [it] off to the side" and kissed her vaginal area, is inconsistent with her statement during the CAC interview that her "underwear stayed on" and that defendant "suck[ed] on the outside of her bottom private with his lips and his tongue." Also, according to defendant, although Amy said during her CAC interview that defendant put his lips on her private areas about ten times, her testimony on direct examination was "that these incidents occurred almost on a daily basis * * * or at least dozens of times." The defendant further points out that "the trial justice made no mention at all of [Amy's] diary—which was in evidence—in which she wrote, during [the period that defendant allegedly molested her], that nothing significant was occurring at her mother's home, and that life there was simply 'blah.'" Finally, with respect to the inconsistency issue, defendant notes that the trial justice did not reconcile Amy's in-court testimony, that defendant never

asked her to perform oral sex on him, with "the pretrial statements by [Amy] to her father, conveyed by him to [Officer Fraatz], * * * that [Amy] had been asked to perform oral sex on, or in fact had oral sex with, [defendant]."

After carefully reviewing the record, we are of the opinion that the trial justice did not overlook or misconceive any material inconsistencies, as defendant contends. The defendant asserts, incorrectly, that Amy's testimony that she had underwear on, but that defendant "pulled [it] off to the side," is inconsistent with her earlier statement that her "underwear stayed on" and that defendant "suck[ed] on the outside of her bottom private with his lips and his tongue." Simply put, no inconsistency exists between these two statements. In both statements, Amy maintained that she was wearing underwear, and defendant does not identify any statement by Amy in which she asserted that defendant merely had oral contact with the outside of her underwear and not her skin. Therefore, contrary to defendant's assertion, no inconsistency exists in this respect.

The defendant similarly argues that an inconsistency exists between Amy's pretrial statement that defendant put his lips on her private areas about ten times and her in-court testimony, during which, defendant asserts, she stated "that these incidents occurred almost on a daily basis * * * or at least dozens of times." However, a review of Amy's testimony makes clear that Amy did not contradict herself on the stand, as defendant alleges. During the part of the testimony in question, Amy was testifying about the various ways in which defendant molested her. It was in the context of that testimony, and immediately after answering that defendant would "rub" her vaginal area with his hands "[u]nderneath" her clothes, that she then was asked how many times "this had

happened" to her. Her answer of "[d]aily, dozens," therefore, more likely refers either to the number of times that defendant "rub[bed]" her vaginal area with his hands "[u]nderneath" her clothes or to the total number of molestations committed by defendant. In either case, Amy clearly was not referring to the number of times that defendant performed cunnilingus on her, and defendant mischaracterizes Amy's testimony to the extent that he argues otherwise. We therefore hold that there was no inconsistency between Amy's pretrial and in-court statements in this respect.

The defendant also makes much of the fact that the trial justice, in her written decision, did not mention Amy's diary, which contained allegedly inconsistent entries, and did not reconcile Amy's testimony, that defendant never asked her to perform oral sex on him, with Officer Fraatz's report, in which the officer wrote that Amy's father conveyed to him that Amy had been asked to perform oral sex on defendant.

Even if the aforementioned "inconsistencies" did exist, it was within the trial justice's discretion to find, as she ultimately did, Amy's testimony to be more credible than the testimony of defendant and the other defense witnesses. The trial justice acknowledged defendant's assertion that Amy's "reportage of the events in question to various officials was inconsistent with her trial testimony." After considering "the entire record," however, the justice ultimately determined that "a profusion of credible and consonant evidence" existed "to support beyond a reasonable doubt the jury's finding of guilt upon the four counts of the indictment." Because this Court is "relegated to reading from a 'lifeless record,' [we] justifiably defer to trial justices who experience firsthand the delivery and demeanor of a witness's testimony." *State v. Guerrero*, 996 A.2d 86, 90 (R.I.2010)

(quoting *State v. Collazo,* 967 A.2d 1106, 1110 (R.I.2009)). Therefore, looking at her credibility determinations "through a prism of deference, as we must," we hold that the trial justice did not err in accepting Amy's testimony as credible. *See State v. Medeiros,* 996 A.2d 115, 122 (R.I. 2010); *see also Guerrero,* 996 A.2d at 90 ("[W]e consistently have engaged in a deferential review of a trial justice's credibility determinations.").

Moreover, we previously have held that in deciding a motion for a new trial, "the trial justice need not refer to all the evidence supporting the decision but need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." *State v. Mondesir,* 891 A.2d 856, 862 (R.I.2006) (quoting *State v. Otero,* 788 A.2d 469, 472 (R.I.2002)). We are satisfied that the trial justice in this case appropriately reviewed "the entire record" and sufficiently outlined her reasons for denying defendant's motion for a new trial. Therefore, she did not err, as defendant suggests, in not referring to Amy's diary in her written decision and in not reconciling one part of Amy's testimony with a previous statement.

## B

### Credibility Determinations

The defendant also argues that the trial justice, in her decision denying his motion for a new trial, failed to mention the context in which Amy's accusations occurred or the testimony of any of the six defense witnesses, including defendant himself. The defendant points out that Amy was upset about the punishments that she was receiving at her mother's house, and that her "dream" was to live with her father. Therefore, defendant asserts, Amy had a motivation to lie about the molestations to "g[e]t [her] way." The defendant also

notes that his "testimony really was not impeached at all," and that he "adamantly denied any sexual abuse of [Amy] whatsoever." Furthermore, defendant points out that Amy's own mother "testified that her daughter was becoming more and more difficult the summer she turned thirteen, and had been punished repeatedly for *lying,*" and that multiple witnesses testified that defendant "was known as a truthful, honest person."

 In essence, defendant challenges the trial justice's credibility determinations. However, "[t]he mere fact that [a] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for new trial." *State v. Rivera,* 987 A.2d 887, 903 (R.I.2010). "[T]he trial justice * * * has [had] the opportunity to observe the witnesses as they testify and therefore is in a better position [than this Court] to weigh the evidence and to pass upon the credibility of the witnesses * * *." *Id.* (quoting *State v. Luanglath,* 749 A.2d 1, 5–6 (R.I.2000)). Therefore, unless the trial justice clearly erred in her credibility determinations or "overlooked or misconceived relevant and material evidence," we will not disturb the justice's determination on appeal. *Banach,* 648 A.2d at 1368 (quoting *Fontaine v. State,* 602 A.2d 521, 525 (R.I.1992)).

In her written decision denying defendant's motion for a new trial, the trial justice stated that she reviewed "the entire record of this case." She also quoted portions of Amy's testimony that she determined to be "relevant," as well as some of Amy's pretrial statements. Although defendant asserts otherwise, the trial justice was under no obligation to exhaustively analyze the evidence or to explicitly articulate her rejection of the testimony of witnesses whom she did not find to be credi-

ble. *See State v. Tate*, 109 R.I. 586, 588–89, 288 A.2d 494, 496 (1972) ("[W]e give a trial justice wide latitude with respect to the form of his decision, and we have never insisted that it be lengthy or that it contain an exhaustive analysis of the evidence, or that it literally tag the testimony of each witness as 'credible' or 'incredible.' ").

Furthermore, we previously have held that when a trial justice accepts or relies upon the testimony of one witness, he or she thereby impliedly rejects conflicting testimony, even if such testimony is not specifically mentioned in the justice's decision. *See State v. Medina*, 747 A.2d 448, 449 (R.I.2000); *In re Susan*, 122 R.I. 677, 683, 411 A.2d 296, 299 (1980); *State v. Correia*, 106 R.I. 655, 664, 262 A.2d 619, 624 (1970). Thus, by accepting Amy's testimony as credible, the trial justice impliedly rejected the conflicting testimony of defendant and the other defense witnesses. Given the deference afforded to the trial justice's ruling, we hold that she did not clearly err in her credibility determinations.

### C

### Matters Not in Evidence

 Lastly, defendant contends that the trial justice erred in referring, in her written decision denying defendant's motion for a new trial, to "matters not in evidence—specifically Det. Sullivan's police narrative" and portions of a DCYF intake report, including "statements [Amy] allegedly made to [an] examining physician." The defendant argues that the trial justice wrongly considered these matters "to demonstrate consistency in the complainant's statements," and that the justice's "decision cannot be upheld on this basis."

In her written decision, the trial justice quoted the following portion of Det. Sullivan's narrative: "[Amy] said her pants came off, but her underwear stayed on. * * * [Amy] said [defendant] would suck on the outside of her bottom private with his lips and his tongue." The trial justice also quoted a portion of Officer Fraatz's narrative, which read: "[Amy] had stated that recently [defendant] began performing oral sex on her vaginal area and breasts." [17] These portions of the police officers' narratives were directly quoted at trial by defendant's counsel. Therefore, they are part of this case's record, and the trial justice did not err in referring to or relying upon them in ruling on defendant's motion for a new trial.

In her decision, the trial justice also referred to a DCYF intake report and quoted portions of that report. She noted that the report indicated that Amy's father initiated contact with DCYF and informed the department that Amy revealed "that [defendant] had 'touched her in a very dirty way' . . . later revealing that he had performed oral sex on her breasts and vaginal area and that she had been asked by [defendant] to perform oral on him." The trial justice additionally referred to the part of the DCYF report indicating that during her CAC interview, Amy stated that defendant "would use his lips and his tongue and suck down there and do circles with his tongue." Finally, the trial justice referred to the portion of the report in which Dr. Wasser stated that Amy told him "that many times during the past 6 months she was touched on/in vagina by fingers and mouth of male friend of her mother at their house at night." The justice also noted that according to Dr. Wasser, Amy was "[n]ever contacted with pe-

---

17. In her decision, the trial justice attributed this statement to Det. Sullivan; however, it is actually contained in Officer Fraatz's narra-

tive. The trial justice's inadvertent error was harmless.

nis and never participated in any sexual contact towards the man."

The referenced portions of the DCYF intake report were not admitted as full exhibits, nor were they read into the record at trial. However, when a trial justice has considered matters not in the record—similar to when a trial justice has admitted inadmissible hearsay evidence at trial—if such evidence is cumulative, and if guilt is established by other competent evidence, any error committed by the trial justice is harmless. *See State v. Fortier*, 427 A.2d 1317, 1325 (R.I.1981) ("It is well settled that the admission of hearsay evidence is not prejudicial when the evidence is merely cumulative and when defendant's guilt is sufficiently established by other competent evidence."); *see also State v. Robinson*, 989 A.2d 965, 979 (R.I.2010) (same); *State v. Golembewski*, 808 A.2d 622, 624 (R.I. 2002) (an error is harmless if it appears beyond a reasonable doubt that it did not contribute to the verdict obtained).

The portions of the DCYF intake report referenced by the trial justice are cumulative of consistent statements already in the record. *See Robinson*, 989 A.2d at 979 (defining cumulative evidence). Moreover, a review of the record reveals an abundance of competent evidence of the defendant's guilt, including detailed trial testimony by Amy and the controlled telephone call. Therefore, we hold that any error committed by the trial justice in referring to portions of the DCYF intake report was harmless and that, ultimately, the justice did not err in denying the defendant's motion for a new trial.

## IV

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.