STATE

v.

**Fernando GUERRA.**

No. 2008–320–C.A.

Supreme Court of Rhode Island.

Feb. 15, 2011.

Virginia M. McGinn, Department of Attorney General, for State.

Catherine Gibran, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The defendant, Fernando Guerra, appeals from the Superior Court's denial of his motion for a new trial, which motion he filed after a jury found him guilty of entering a building with the intent to commit larceny. On appeal, the defendant contends that the trial justice's denial of his motion for a new trial was clearly erroneous because, from the defendant's perspective, the jury's verdict was against the fair preponderance of the evidence and failed to do substantial justice.

This case came before the Supreme Court for oral argument on September 29, 2010, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the record, the memoranda submitted by the parties, and the oral arguments of counsel, we are of the opinion that cause has not been shown and that the case should be decided at this time.

For the reasons set forth below, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

On March 21, 2007, Fernando Guerra was charged by criminal information with the following counts: (1) entering the business of O. Ahlborg & Sons on October 10, 2005, with the intent to commit larceny, in violation of G.L.1956 § 11–8–3, and (2) larceny from O. Ahlborg & Sons on October 10, 2005 of two laptop computers valued at

more than $500, in violation of G.L.1956 § 11–41–1 and § 11–41–5.

A jury trial was held in the Superior Court for Providence County on May 19 and 20, 2008. We summarize below the most pertinent testimony presented at trial.

## A

## The Trial

### 1. The Testimony of Eric Ahlborg

Eric Ahlborg testified at trial that he was employed by O. Ahlborg & Sons,[1] which he characterized as a "construction business." Mr. Ahlborg further testified that, on October 10, 2005, he went to the company's office in Cranston, even though the business was closed because that day was the Columbus Day holiday. It was Mr. Ahlborg's recollection that no other employees reported for work that day and that the parking lot was empty.

Mr. Ahlborg testified that, as he was entering the office building, he saw a "male carrying something just exiting out the door." Mr. Ahlborg testified that, "for curiosity's sake," he pursued that male (later identified as defendant) to determine who he was; he stated that he saw defendant enter his car and drive "right by the entrance where [Mr. Ahlborg] was standing." He further testified that he was able to stop defendant's vehicle so as to ask him why he was on the premises. According to Mr. Ahlborg, defendant replied: "I was here to see John." It was Mr. Ahlborg's further testimony that he then inquired,

"John who?" and that defendant responded, "John Pastore." Mr. Ahlborg testified that he wanted to ask more questions of defendant and that he believed that defendant had indicated that he would pull over into a parking spot so that the two men could speak further. It was Mr. Ahlborg's further testimony, however, that defendant proceeded to drive "right out the parking lot;" he added that, as defendant was driving away, he noted the license plate number of the car that defendant was operating and immediately wrote the number down—viz., Y205566. He stated that, because the license plate was not a Rhode Island license plate, he assumed that it was a Massachusetts plate.

Mr. Ahlborg testified that, the next morning, he notified Jim Rowley, who he said was the Director of Safety and Security for O. Ahlborg & Sons, about what had occurred on Columbus Day. He stated that Mr. Rowley informed him that one or two computers were missing. Mr. Ahlborg testified that he then instructed Mr. Rowley to inform the police about what he (i.e., Mr. Ahlborg) had observed on Columbus Day and about the missing computers. He also stated that, in addition, he personally provided the police with a statement.

Mr. Ahlborg testified that, on June 2, 2006, Cranston Police Detective Paula Ann Duffy came to his office in connection with his Columbus Day encounter with defendant.[2] He stated that Detective Duffy showed him an array of six photographs and asked him to try to identify the person whom he had seen on the premises on Columbus Day of 2005. It was Mr. Ahl-

---

1. We note that the various witnesses presented by the prosecution referred to the construction company by a number of slightly different names. We shall hereinafter refer to the company as "O. Ahlborg & Sons," since that is the name that appears on the criminal information sheet.

2. Detective Duffy testified that she did some investigative work with respect to the Columbus Day incident after she learned about same. However, it was only after a second incident in the Spring of 2006 (which incident we describe below) that she showed Mr. Ahlborg the photo array.

borg's testimony that he selected photograph number six, and he stated that he was 99 percent certain of the correctness of his selection. In addition, at trial, Mr. Ahlborg made a positive in-court identification of defendant as the person pictured in photograph number six.

On cross-examination, Mr. Ahlborg was questioned as to how he himself had gained entry to his office building on Columbus Day. He testified that the building utilized an "electronic fob system," whereby he was able to use a "fob" to unlock the door and gain entry. According to Mr. Ahlborg, the exterior doors to the front entrance of the building automatically unlock at 8 a.m. on a normal workday. He testified that, on Columbus Day of 2005, even though the office was closed for the holiday, there had been an inadvertent failure to set the electronic fob system so as to keep the doors locked. Mr. Ahlborg testified that, therefore, "[i]t was like a typical Monday"—*i.e.*, the exterior doors of the front entrance unlocked automatically at 8 a.m. It was Mr. Ahlborg's testimony that the exterior doors of the front entrance would have been open to anyone on that Columbus Day.

Mr. Ahlborg further testified that, once inside the building, a person could have gained access to the interior offices. He stated that the doors to those offices are locked using a magnetic striped device but that it would be possible "to shimmy it or pull real hard * * * [to] release that magnetic stripe."

### 2. The Testimony of James Rowley

James Rowley testified that he is a former state police officer; he stated that he had been an "executive officer with the rank of major." He testified that, at all times pertinent to the alleged criminal conduct, he was employed by O. Ahlborg & Sons as the Director of Safety. He testified that, on October 11, 2005, he was informed that two computers were missing from the estimating department. Mr. Rowley stated that, in his judgment, those computers were "[p]robably worth $2500 each." He added that a milk container was also missing from beneath a certain desk. He further testified that, on October 11, Mr. Ahlborg informed him that, the day before, "he had encountered a male in the building that was carrying something out;" he stated that he believed that Mr. Ahlborg had said that the item being carried out was a milk container.

Mr. Rowley also testified that Mr. Ahlborg told him that defendant had mentioned the name John Pastore during their brief conversation on Columbus Day. He stated that he was familiar with that particular name because John O. Pastore was once the Governor of Rhode Island and also a United States Senator from the state. Mr. Rowley further testified that some "very, very large plans, three by four feet," for the "John Pastore Complex" were on display in the company's plan room—which he said was located next to the estimating department. It was Mr. Rowley's testimony that a person would have had to go through a second set of doors to enter the plan room; he stated that "there's a first set of doors, the foyer, and then you go through a door into the planning office and then there's another door that leads into the estimating office."

Mr. Rowley then explained in some detail the various ways that one could gain entrance to the plan room (where the plans for the John Pastore Complex were located) and the estimators' office (where the stolen computers were located):

"[T]here's two ways to travel. If you come in the front door and go to the left and that door is open, then you can go right in past where the plans were and then into the estimators' office area. If

that door is locked, there's two doors leading into the elevator section and reception area of the building and that door is locked. You need a pass to get in, a pass fob, they call it. So, you could either go left, if the door is open, you can get in, or you can bypass the security and get in and go around the back and get back into the west wing."

Mr. Rowley testified that, after his discussion with Mr. Ahlborg on October 11, 2005, he filed a complaint with the Cranston Police Department. He stated that he indicated to the police that two computers had been stolen; he added that he provided the police with a description of the person whom Mr. Ahlborg had seen and of the vehicle which he had observed.

Mr. Rowley then proceeded to testify about a second incident that occurred several months after the Columbus Day incident. He said that, on May 23, 2006, at approximately 5:10 p.m., he was alerted by a fellow employee that there was "a male in the foyer;" he added that the employee wanted him to determine what that person was doing in the building. Mr. Rowley testified that, by the time he arrived in the foyer, it was empty but that he "observed a vehicle parked in front." He stated that he then exited the building in order to "check the vehicle;" he said that he observed a child of four or five years of age inside the car. Mr. Rowley testified that he returned to the foyer and waited a few moments, and then defendant emerged from the "west wing of the building around the reception area."

It was Mr. Rowley's testimony that only he and one other employee were present in the building at the time in question and that only their two respective cars would have been present in the parking lot. According to Mr. Rowley, when he asked defendant "how he got in the building and what he was doing," defendant responded that he was looking for construction work and that the door had been unlocked. According to Mr. Rowley, however, the door was not unlocked; and he testified that he knew that to be the case because he had had to use his "pass" to gain entry when he returned from the parking lot.

Mr. Rowley testified that he asked defendant for identification and for his driver's license. Mr. Rowley stated that defendant was able to produce a credit card; he added that the credit card bore the name of Fernando Guerra. He further testified that defendant also provided his address, date of birth, and cell phone number. Mr. Rowley testified that he then escorted defendant out to his vehicle and wrote down the license plate number of the vehicle—"Y205566 Illinois." He testified that he also asked the child in the back seat what his name was; Mr. Rowley's recollection was that the child's answer was either "Tim Fernandez" or "Tim Hernandez."

Mr. Rowley further testified that he then compared the license plate number that he had just written down with the license plate number that was in his file in connection with the events of Columbus Day 2005. He testified that the two license plate *numbers* were identical, although two different states had been referenced.[3] He testified that he then informed the Cranston Police about what he had learned.

It was Mr. Rowley's testimony that, thereafter, Detective Duffy of the Cran-

---

**3.** It will be recalled that Mr. Ahlborg in October of 2005 had *assumed* that the non-Rhode Island vehicle bearing plate number Y205566 was from Massachusetts. By contrast, Mr. Rowley in May of 2006 *specifically noted* that the vehicle with that plate number was from Illinois.

ston Police Department came to O. Ahlborg & Sons. He testified that the detective showed him an array of photographs; he said that, in reference to the May 23 incident, the detective asked him to "pick out the person that [he] talked to." Mr. Rowley stated that he circled the photograph of the person with whom he had spoken on that day. At trial, Mr. Rowley made a positive in-court identification of defendant as the person pictured in the photograph that he had selected from the array presented by Detective Duffy.

Mr. Rowley also testified that one could "trip" the locking system to get "into the inside of the building." He described the process as follows: "If someone walks by in the foyer and keeps going, the door is activated open for twenty-five to thirty seconds." He also testified that "[i]f you're walking out of the building, they'll trip automatically; but if you walk past the doors within ten feet, as I believe [an employee] did, you trip those doors open."

### 3. The Testimony of Detective Paula Duffy

Detective Paula Duffy testified that, on October 12 or 13, 2005, she was assigned to conduct an investigation into an entry with intent to commit larceny at O. Ahlborg & Sons. She testified that she checked the vehicle registration number that had been referred to in the initial police report, *viz.*, Massachusetts number Y205566; she stated that "it came back no record found." Detective Duffy further testified that, on May 23, 2006, the same license plate number was checked once again—this time, as an Illinois license plate. According to the detective, that license plate number "came back to Shalimar Hernandez."

Detective Duffy further testified that she had been able to obtain a photograph of defendant, Fernando Guerra. She testified that she prepared a photo array and presented it to both Mr. Ahlborg and Mr. Rowley on June 2, 2006. It was Detective Duffy's testimony that both Mr. Rowley and Mr. Ahlborg selected the photograph of defendant, Mr. Guerra.

### 4. The Remainder of the Trial

At the conclusion of its case, the prosecution presented a stipulation signed by both the prosecutor and counsel for defendant. That stipulation reads in pertinent part as follows:

"1. On October 10, 2005, Fernando Guerra was the operator of an older model brown Lincoln with Illinois registration, Y205566 which was registered to his girlfriend Shalimar Hernandez with whom he has a young male child.

"2. On May 23, 2006, Fernando Guerra was again the operator of the same vehicle registered to his girlfriend, Shalimar Hernandez."

In closing argument, counsel for defendant characterized the stipulation as follows: "What [defendant] did do is stipulate freely to the fact that on October 10th, 2005, and May 23rd, 2006, he [defendant] was, in fact, at O.H. Ahlborg in Cranston, Rhode Island."

At the close of the prosecution's case, defendant made a motion for judgment of acquittal as to both counts; that motion was denied. Mr. Guerra did not present any witnesses or evidence in his defense.

### 5. The Verdict

On May 20, the jury found Mr. Guerra guilty as to count 1 (entering a building with the intent to commit larceny), but not guilty as to count 2 (larceny in excess of $500). Thereafter, defendant filed a motion for a new trial, and on May 30, 2008 a hearing was held on that motion; the motion was denied the same day. On July 24, 2008, Mr. Guerra was sentenced to ten

years, with three years to serve and seven years suspended, with probation. On August 5, 2008, defendant filed a notice of appeal.[4]

## B

### Defendant's Motion for a New Trial

On May 30, 2008, a hearing was held on defendant's motion for a new trial. During the hearing, counsel for defendant articulated a number of arguments in support of his motion. The defendant contended, *inter alia*, that the prosecution failed to present sufficient evidence of "felonious intent at the * * * crucial time of breaking and entering" and that the verdict was "logically inconsistent" because the jury found defendant guilty with respect to count 1 but not guilty as to count 2. The prosecution responded to those several contentions; and, after considering the competing arguments, the trial justice denied the motion.

On appeal, defendant has focused attention on a single argument—*viz.*, that the trial justice was clearly wrong in denying his motion for a new trial because, from defendant's perspective, the jury's verdict was against the fair preponderance of the evidence and failed to do substantial justice. More specifically, defendant vigorously contends that there was insufficient evidence or, indeed, "no evidence whatsoever" that defendant entered the premises with the requisite felonious intent.

## II

### Standard of Review

■■■ When ruling on a motion for a new trial, the trial justice "acts as a thir-

teenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. DiCarlo*, 987 A.2d 867, 870 (R.I.2010) (internal quotation marks omitted); *see also State v. Adefusika*, 989 A.2d 467, 480 (R.I.2010); *State v. Imbruglia*, 913 A.2d 1022, 1028 (R.I.2007). In so doing, it is the trial justice's responsibility to conduct an analytical process consisting of at least three steps. *DiCarlo*, 987 A.2d at 870; *see also State v. Rivera*, 839 A.2d 497, 502 (R.I.2003). The trial justice must "(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *State v. Morales*, 895 A.2d 114, 121 (R.I.2006); *see also DiCarlo*, 987 A.2d at 870.

■■■ If, after conducting that analysis, the trial justice is in agreement with the jury's verdict or determines that, based upon the evidence, "reasonable minds could differ as to the proper outcome," then the inquiry is at an end and the motion for a new trial should be denied. *Morales*, 895 A.2d at 121; *see also State v. DeOliveira*, 972 A.2d 653, 665 (R.I.2009). If, however, the trial justice is not in agreement with the jury's verdict, then it is incumbent upon him or her to embark on a fourth analytical step. *DiCarlo*, 987 A.2d at 870; *see also Adefusika*, 989 A.2d at 480. The task of the trial justice with respect to that fourth step has been described as follows:

"[H]e or she must determine whether the verdict is against the fair preponder-

---

4. The actual judgment of conviction was not entered until November 24, 2008. However, Article I, Rule 4(b) of the Supreme Court Rules of Appellate Procedure provides that "[a] notice of appeal filed after the announce-

ment of a decision, sentence or order but before entry of the judgment or order shall be treated as filed after such entry and on the day thereof." *See, e.g., State v. Peoples*, 996 A.2d 660, 663 n. 2 (R.I.2010).

ance of the evidence and fails to do substantial justice. If the verdict meets this standard, then a new trial may be granted." *Rivera,* 839 A.2d at 503; *see also DiCarlo,* 987 A.2d at 870.

■ With respect to the sufficiency of the record that will be reviewed by this Court, we have indicated that the record should "reflect a few sentences of the justice's reasoning on each point." *State v. Banach,* 648 A.2d 1363, 1367 (R.I.1994). "In providing a rationale for a decision, * * * the trial justice need not refer to *all* the evidence supporting the decision * * *." *Id.* (emphasis added); *see also Di-Carlo,* 987 A.2d at 870. The trial justice "need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." *Banach,* 648 A.2d at 1367; *see also DiCarlo,* 987 A.2d at 870.

■ On appeal, "the moving party bears the burden of convincing this [C]ourt that the trial justice did not conscientiously apply these standards." *Banach,* 648 A.2d at 1367; *see also DiCarlo,* 987 A.2d at 871 n. 6. In conducting our review, "we accord great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." *State v. Texieira,* 944 A.2d 132, 140–41 (R.I.2008); *see also DiCarlo,* 987 A.2d at 870–71. This Court will not overturn a trial justice's determination with regard to such a motion "unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." *DiCarlo,* 987 A.2d at 871 (alteration in original) (internal quotation marks omitted). This Court "employ[s] this deferential standard of review * * * because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Texieira,* 944 A.2d at 141; *see also Adefusika,* 989 A.2d at 480.

## III

### Analysis

■ In rendering his decision, the trial justice summarized the testimony and evidence presented at trial. With respect to defendant's argument that there was insufficient evidence of felonious intent, the trial justice found that the jury "had plenty of circumstantial evidence that he was in that building on that day with the intent to commit some kind of larceny." He then provided a detailed account of the testimony and evidence from which the jury could have drawn such an inference. The trial justice concluded that account as follows:

> "Having considered all of the evidence presented during the trial, the Court is satisfied that the jury rightfully accepted Ahlborg and Rowley and the testimony that they gave and that they had every reason to conclude, as they did, that this man entered that building with the intent to commit larceny inside. And that using their authority as factfinders, they concluded that with regard to the actual larceny he may not have been guilty because, I think, they didn't find the goods on him when he was apprehended.
>
> "For these reasons *I think the jury literally nailed it right on the head with regard to the verdict.* * * * And I think there certainly was enough evidence for them to find as they did with regard to Count 1." (Emphasis added.)

The trial justice also specifically addressed defendant's contention in his motion for a new trial that the jury's verdict was "logically inconsistent." In doing so, the trial justice found that, contrary to

defendant's assertion, the fact that the jury found defendant guilty as to count 1 (entering a building with the intent to commit larceny) and not guilty as to count 2 (larceny in excess of $500) "may sound quite logical and really quite intelligent on [the jury's] part." More specifically, the trial justice observed as follows:

> "In this case the jury was right on as to what they did. They were satisfied from all the evidence presented, not only from Mr. Ahlborg and Mr. Rowley but the circumstantial evidence they had, that this gentleman was in the building on October 10 and he entered that building with the intent to commit larceny therein. While they found that, they may well have concluded that since the defendant wasn't found red-handed with the laptop in his possession that perhaps that was the reason why they should not find him guilty on the actual physical possession or larceny of the item. *And that may sound quite logical and really quite intelligent on their part.*" (Emphasis added.)

The trial justice concluded by stating that he was "satisfied that the State has produced * * * evidence to prove beyond a reasonable doubt that the defendant committed the crime for which he was convicted, to wit, entry of a building with intent to commit larceny." The trial justice also indicated that he was satisfied that "the jury understood and followed its instruction in reaching their verdict." Ac-

cordingly, he denied defendant's motion for a new trial.

After carefully reviewing the entire record, as well as the trial justice's considered analysis of the evidence in light of the criteria that apply in the context of motions for new trial, we are convinced that the trial justice employed the appropriate analytical approach before deciding to deny the defendant's motion for a new trial. It is evident that the trial justice performed that function carefully and completely, while more than adequately articulating his reasons for denying the defendant's motion. And, we perceive no basis in the record for ruling that the trial justice was either clearly wrong or that he misconceived or overlooked material evidence in denying the defendant's motion. *See Adefusika,* 989 A.2d at 481; *DiCarlo,* 987 A.2d at 872–73.

## IV

### Conclusion

For the reasons discussed in this opinion, we affirm the judgment of the Superior Court. The record in this case may be returned to that tribunal.

Justice INDEGLIA did not participate.