**STATE**

v.

**Allen WRAY.**

**No. 2010–209–C.A.**

Supreme Court of Rhode Island.

March 9, 2012.

---

Jane M. McSoley, Department of Attorney General, for State.

Catherine Gibran, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.
"You must remember this,
A kiss is still a kiss,
A sigh is just a sigh;
The fundamental things apply,
As time goes by." [1]

On the evening of January 27, 2006, two women were robbed at gunpoint in the Mount Pleasant neighborhood in the City of Providence. After divesting the women of a pocketbook and a cellular telephone, the gunman kissed one of the women on the cheek and thanked her. Notwithstanding these courtesies, the defendant, Allen Wray, was charged with these misdeeds and ultimately was convicted by a jury of two counts of first-degree robbery. On appeal, the defendant argues that the trial justice erred in denying his motion for a new trial. According to the defen-dant, the eyewitness identifications that led to his conviction were unreliable and not substantial enough to prove beyond a reasonable doubt that he committed the robberies in question. Mr. Wray also contends that the trial justice committed reversible error by allowing another witness to vouch for the credibility of the two eyewitnesses. This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

At around nine o'clock in the evening on January 27, 2006, cousins Rashida Lovett and Toni Matthews were walking from a friend's house on their way to their grandmother's house on Rockingham Street in Providence.[2] As the two women were walking on Yale Avenue, approaching Carleton Street, they noticed "a four door gray box car" that looked like an "old Lincoln" on the other side of the street.[3] Ms. Lovett testified that she observed "a white dude" with a "fat face"[4] in the driv-

---

1. Herman Hupfeld, As Time Goes By (Warner Brothers, Inc.1931). This song was immortalized when sung by Dooley Wilson (Sam) in the movie "Casablanca." See Casablanca (Warner Brothers Pictures 1942).

2. At that time, Ms. Lovett resided at the Rockingham Street address with her grandmother and daughter.

3. Ms. Lovett testified that the car was parked when she first noticed it; Ms. Matthews, how-ever, testified that she first saw the car, with its headlights on, moving toward her and her cousin, but that the car then pulled up and parked.

4. On cross-examination, Ms. Lovett testified that she could not remember this individual's eye color, hair color, or the clothes that he was wearing; she also stated that she did not recall whether he had any scars or whether he was smiling.

er's seat and defendant in the backseat behind the driver.[5] Ms. Matthews testified that it took fifteen seconds "from the time [they] noticed the car on that street to the time [they] walked past it," and that she was able to see "two people inside the car,"[6] but could "[n]ot really" describe the people "specifically." Ms. Matthews also testified that she saw a man, whom she later identified as defendant, get out of the car and run "like he was running to a house."

About two minutes after the women passed the car, Ms. Lovett testified, she "heard leaves crumbling, like someone was walking on leaves, and then [she] turned around and [saw defendant] running with a gun" toward her and Ms. Matthews.[7] Ms. Matthews similarly testified that defendant "[ran] right up behind" her and Ms. Lovett, although she did not hear anything beforehand. Ms. Lovett testified that defendant pointed a silver gun an inch or two from her face and yelled "[g]ive me what you have."[8] Ms. Lovett then handed him her pocketbook,[9] at which point defendant turned to Ms. Matthews and "told her to give him what she got."[10] After some hesitation, Ms. Matthews handed her cellular telephone over to defendant and defen-

dant then kissed her on the cheek, said "[t]hank you for participating," and ran to the same gray Lincoln that the women had seen parked on Yale Avenue a few minutes earlier. The women then observed as the car drove "[u]p Yale [Avenue] to Mount Pleasant [Avenue]."

Ms. Lovett testified that at the time of the robbery, the robber was wearing "blue jeans, a black flight jacket, * * * a black hoodie on under it and a hat." She further testified that he had a beard and a moustache and "looked like he [had not] shaved in * * * two to three days." She described the gunman as being about 5'9", in his late twenties or early thirties, and weighing about 130 pounds, and she testified that he "looked like he had acne." Ms. Matthews described the man who accosted them as "a dark male with a moustache, like he hadn't shaved in a couple of days," "skinny," and 5'8" to 6' tall. According to Ms. Matthews, he was wearing "dark blue jeans and a black hoodie" at the time of the robbery.

After defendant drove off in the car, Ms. Lovett and Ms. Matthews walked to their grandmother's house on Rockingham Street, where Ms. Lovett called the police.[11] Shortly thereafter, the police ar-

---

**5.** Ms. Lovett testified that at the time she made this observation, the lighting conditions were "fair" and the windows of the car were not tinted.

**6.** On cross-examination, Ms. Matthews admitted that in her statement to the police, she said that "[t]here was a third man in the backseat, but [she] couldn't see him very well."

**7.** By this point, the women had crossed Carleton Street and were walking on Armington Avenue.

**8.** Ms. Matthews similarly testified, but stated that defendant was two to three feet away and that his gun "was pointed mostly towards the ground but up a little bit."

**9.** According to Ms. Lovett, her pocketbook contained her identification card, her bank cards, her Medicaid cards, as well as her and her daughter's birth certificates and Social Security cards.

**10.** Ms. Lovett testified on direct examination that defendant pointed the gun at Ms. Matthews. On cross-examination, however, Ms. Lovett admitted that she did not remember whether defendant actually pointed the gun at Ms. Matthews. Ms. Matthews did not testify that defendant pointed the gun at her.

**11.** Ms. Lovett testified that on the way to Rockingham Street, she flagged down a police officer and told him that she and Ms. Matthews "just got robbed." That officer told the women to go to Academy Avenue, where

rived and drove Ms. Lovett and Ms. Matthews to the police station. The two women were taken into separate rooms, and each gave a statement about the incident. Afterwards, Ms. Lovett and Ms. Matthews returned to their respective homes.

Shortly after arriving home, Ms. Lovett left to go to her friend's house on Yale Avenue "[b]ecause [she] wanted to go to the bar around the corner * * * to see if [her] pocketbook was thrown out of the car or something." Ms. Lovett visited the bar, called "Old Timers Tap," where she obtained some information about the location of her purse. Thereafter, she headed "two to three blocks" down to Leah Street, where she spotted the car used in the robbery and defendant standing on the porch of a house "talking on the cell phone." According to Ms. Lovett, defendant was wearing the same clothes that he wore during the robbery. Ms. Lovett then returned to her friend's house and called the police. After the police arrived, they headed with Ms. Lovett to the house where she had spotted defendant; however, before they arrived at that location and as they were driving down Yale Avenue toward Leah Street, Ms. Lovett saw "defendant and the white man" driving in the opposite direction in the car that was used in the robbery. The police pulled the car over and Ms. Lovett identified defendant as the robber, although she noted that he had changed his clothes since the last time she saw him on the porch and that he now

"had on a gray sweatsuit." [12] Ms. Lovett also recognized "the white man" as being "the same white male" that she spotted in the car prior to the robbery. [13]

Two days later, on January 29, 2006, Robert Melaragno, a detective in the robbery squad of the Providence Police Department, contacted Ms. Matthews and "explained that [he] needed her to come down [to the police station] and view a photo array." Ms. Matthews testified that Det. Melaragno told her "that they might have got somebody." At the police station, Ms. Matthews was shown a group of six photographs and was instructed that these photographs "may or may not contain a picture" of the person who had robbed her and Ms. Lovett. Detective Melaragno testified that he told Ms. Matthews "to look at all of the photographs and take her time," and that he never suggested to her "that the person responsible may be in that photo array." Ms. Matthews immediately recognized one of the men in the array as a former coworker of her mother. She then identified defendant's photograph as the photograph of the person who had committed the robbery. [14]

Detective Melaragno testified about his investigation of the robbery. He testified that at around nine o'clock in the evening on January 27, 2006, he "monitored a radio broadcast of a robbery that had occurred * * * in the area of * * * Carleton [Street] and Yale [Avenue]." Because Det. Melaragno "was working on another

---

another police officer supposedly was located. Upon not finding an officer on Academy Avenue, Ms. Lovett and Ms. Matthews continued to their grandmother's house.

**12.** The defendant was patted down by a police officer; no weapons were found on his person.

**13.** The "white man" later was identified as Robert Ferreira, and the car in question

turned out to be a 1989 Grand Marquis belonging to his mother.

**14.** Ms. Matthews testified that it took her between five and fifteen minutes, from the time that she was given the instructions, to identify defendant. Detective Melaragno testified that it took Ms. Matthews "[a]bout one to two minutes," from the time that she was shown the photo array, to identify defendant.

robbery which had happened just prior" to the broadcast, he "put it in [his] head, but * * * was hoping another detective was able to respond to that immediately." Then, "[a] couple of minutes after midnight," Det. Melaragno monitored another broadcast about the same Yale Avenue robbery. He testified that at approximately 1:20 in the morning on January 28, 2006, he took Ms. Lovett's statement, and that he thereafter "spoke with members of the patrol bureau who had responded to that area and had been involved on the street level." By this point, Det. Melaragno testified, defendant had been apprehended as a suspect and a 1989 Grand Marquis was "associated with that suspect."

On cross-examination, Det. Melaragno admitted that he did not inventory defendant's personal belongings when defendant was brought to the police station; did not inventory the contents of the car associated with defendant on the night of the robbery; and did not search the house on Leah Street where Ms. Lovett observed defendant talking on a cellular telephone. Detective Melaragno testified that he did not do these things because he felt that his "first responsibility * * * at that point in time was to take statements from the victim * * * while the recollections were freshest in her mind of the incident she had just explained to the police," and that he "also had two suspects who were transported to central station [whom he] wanted to speak with." The detective also explained that he did not send anyone else to perform the above-summarized tasks because he "like[s] to handle things as much as [he] can [him]self so [he] can be assured that things are done the way [he] want[s] them done."

Detective Melaragno also testified on cross-examination that the suspect in the other robbery that occurred in the Mount Pleasant area on the evening of January 27, 2006, was described as "a black male with a stocky build, about six feet tall" and wearing "dark-colored sweats." The detective admitted that these two robberies could have been committed by the same person, and that no suspect ever was arrested in the other robbery. Detective Melaragno also was questioned about his decision not to charge Robert Ferreira, the "white man" in the car with defendant, with conspiracy to commit robbery; he responded that there was insufficient evidence to charge Mr. Ferreira.

A grand jury indicted Mr. Wray on two counts of first-degree robbery, and, after a three-day trial in December 2008, a jury found him guilty on both counts. On December 15, 2008, defendant filed a motion for a new trial, which the trial justice denied following a hearing on January 23, 2009. On April 24, 2009, defendant was sentenced to twenty years at the Adult Correctional Institutions, with ten years to serve and ten years suspended, with probation, on each count. The sentences were to run concurrently. Also on April 24, 2009, defendant appealed to this Court, and a judgment of conviction and commitment subsequently was entered on May 19, 2009.[15] Additional facts will be supplied as needed.

## II

### Discussion

#### A

#### Motion for New Trial

■ On appeal, defendant first argues that the trial justice "overlooked or mis-

---

**15.** "Although defendant's notice of appeal was premature, it was nevertheless valid." *State v. Chase,* 9 A.3d 1248, 1252 n. 2 (R.I. 2010); *see also Otero v. State,* 996 A.2d 667, 670 n. 3 (R.I.2010).

conceived material evidence in denying his motion for a new trial." In particular, defendant contends that the reliability of Ms. Lovett's and Ms. Matthews's identifications of defendant as the perpetrator of the robbery "is highly dubious, at best." According to defendant, the cousins saw their robber "on that dark winter night * * * for ten seconds at the most in only fair lighting conditions under highly stressful circumstances." Furthermore, according to defendant, although Ms. Lovett purportedly was certain in her identification of defendant, she "could provide very few descriptive details about the [robber's] facial features," and Ms. Matthews's identification "was certainly more tentative than [Ms.] Lovett's." The defendant also cites a litany of authorities for the proposition that mistaken identifications often are the "cause for the miscarriage of justice in the criminal process," and he suggests that in this case, Ms. Lovett's and Ms. Matthews's identifications, even if truthful, were unreliable and "simply did not prove beyond a reasonable doubt" that defendant committed the robbery in question.

■ When ruling on a motion for a new trial, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Prout*, 996 A.2d 641, 645 (R.I.2010) (quoting *State v. Bergevine*, 942 A.2d 974, 981 (R.I.2008)). "[T]he trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *State v. Cerda*, 957 A.2d 382, 385 (R.I.2008) (quoting *State v. Schloesser*, 940 A.2d 637, 639 (R.I.2007)); *see also State v. Guerra*, 12 A.3d 759, 765 (R.I.2011). The trial justice should deny the motion for a

new trial "[i]f 'the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome.'" *Prout*, 996 A.2d at 645 (quoting *Cerda*, 957 A.2d at 385). However, if the trial justice does not agree with the jury's verdict, he or she must "embark on a fourth analytical step." *Guerra*, 12 A.3d at 765. This step requires the trial justice to "determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." *Id.* at 765–66 (quoting *State v. Rivera*, 839 A.2d 497, 503 (R.I.2003)). "If the verdict meets this standard, then a new trial may be granted." *Id.* at 766 (quoting *Rivera*, 839 A.2d at 503).

■ "This Court's review of a trial justice's decision on a motion for a new trial is deferential." *Prout*, 996 A.2d at 645. This is because a trial justice is "present during all phases of the trial, [and] is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Guerra*, 12 A.3d at 766 (quoting *State v. Texieira*, 944 A.2d 132, 141 (R.I.2008)). Thus, when "the trial justice has articulated a sufficient rationale for denying a motion for a new trial, the decision will be given great weight," and we will disturb it only if the trial justice "has overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong." *State v. Banach*, 648 A.2d 1363, 1367 (R.I. 1994).

In the case at hand, the trial justice set forth and applied the correct standard in reviewing defendant's motion for a new trial. He first considered the evidence in light of the jury charge, focusing in particular on the testimonies of Ms. Lovett and Ms. Matthews. The trial justice noted that both women testified that they were walking in the Mount Pleasant area of Providence when defendant robbed them.

He further reviewed their testimonies with respect to the "distinctive" car involved in the robbery, the occupants of the car, and Ms. Lovett's independent investigation that led to defendant's arrest. The trial justice acknowledged that "certain inconsistencies" existed between the women's testimonies, such as whether defendant pointed his gun at Ms. Lovett's face or to the ground, but he reasoned that such inconsistencies are "not unusual in these kinds of cases."[16] The trial justice also considered Det. Melaragno's testimony "about what the police didn't do in this case," but he noted that the jury heard this testimony as well and was able to compare it to Ms. Lovett's and Ms. Matthews's multiple identifications of defendant. The trial justice pointed out that the jury charge, which "was not objected to, * * * was the usual charge * * * give[n] in cases of this nature with regard to how juries look at the credibility of witnesses." He went on to say that "one of the particular instructions is that any one witness is sufficient to prove any one particular fact."

The trial justice then independently assessed the credibility of the witnesses and the weight of the evidence. He noted that "here we have two women on two different occasions describing and identifying this [d]efendant as the person who perpetrated the robbery" and, despite "certain differences of opinion[,] * * * pretty much recall[ing] what happened to them." The trial justice, "in [his] independent evaluation of both witnesses," found them to be credible, particularly Ms. Lovett, who "undertook her own investigation * * * to solve the case." The trial justice further found that, in light of the "two strong identifications from apparently credible complaining witnesses" in this case, "[n]ot

much more was needed" to convict defendant. Ultimately, the trial justice agreed with the jury's verdict and denied defendant's motion for a new trial.

The defendant attempts to paint Ms. Lovett's and Ms. Matthews's identifications of defendant as "highly dubious, at best." He asserts that "the young women saw the robber face-to-face on that dark winter night * * * for ten seconds at the most in only fair lighting conditions under highly stressful circumstances," and that "much of their attention was directed toward the gun." The defendant's assertion, however, essentially concerns the witnesses' credibility—an issue for the jury. *See State v. Mendoza*, 709 A.2d 1030, 1036 (R.I.1998) (holding that weaknesses in witness's identification testimony "went merely to the witness's credibility and were facts for the jury to consider when assessing credibility in reaching its verdict"). The jury in this case heard all of the trial testimony, including cross-examination designed to weaken the witnesses' credibility with respect to their identifications of defendant. The trial justice then reviewed all of this testimony and agreed with the jury that there was sufficient evidence to convict defendant beyond a reasonable doubt. In light of our deferential review of the trial justice's findings, we cannot say that he erred in his determinations.

The defendant also cites to *State v. Nicoletti*, 471 A.2d 613 (R.I.1984), asserting that in that case, the inaccuracy of a witness's description "weighed heavily against a finding of reliability." In *Nicoletti*, we vacated a defendant's robbery and burglary convictions and remanded the case for a new trial. *Id.* at 614, 618. In so doing, we held that witness identification testimony of the defendant as the perpetrator should have been excluded because the manner in

---

**16.** The trial justice also noted that the jury "heard the cross-examination which was designed to try to disengage the jury from [the witnesses'] identifications."

which it was elicited by the police was unnecessarily suggestive. *Id.* at 616. Although we pointed out that there was a "high degree of possible misidentification" because the witness's description of the defendant "radically differ[ed] from [the] defendant's physical appearance," we did so "in light of the suggestive methods used in the pretrial identification." *Id.* The physical discrepancies, by themselves, did not form the basis of our holding in *Nicoletti*. Here, there is no assertion that the two witnesses' identifications of defendant were elicited by means of unnecessarily suggestive methods; thus, defendant's reliance on *Nicoletti* is misplaced.

Upon a review of the record, it is clear that the trial justice sufficiently articulated his rationale for denying defendant's motion. Furthermore, we are of the opinion that the trial justice did not overlook or misconceive any material evidence. We hold, therefore, that the trial justice did not err in denying defendant's motion for a new trial.

## B

### Impermissible Bolstering

 The defendant additionally argues on appeal that the trial justice "committed reversible error by permitting [Det. Melaragno] to vouch for the credibility of the identification witnesses." On direct examination of Det. Melaragno, the following exchange occurred:

"[State:] And prior to meeting [defendant], had you during the course of your investigation received dispatches relative to a description of a suspect?

"[Detective Melaragno:] Yes.

"[State:] And were you able to compare those descriptions with [defendant] as you saw him?

"[Detective Melaragno:] Yes.

"[State:] And what conclusion did you reach?

"[Defendant's Counsel]: Objection.

"[Trial Justice]: Overruled.

"[Detective Melaragno:] I thought he fit—I thought he fit the description.

"[Defendant's Counsel]: Well, I object. I want to be heard."

At the sidebar that followed, defendant's counsel elaborated on his objection:

"My objection is I believe this line of testimony is vouching for the credibility of the identification witnesses. That is my objection. I don't believe a witness can be asked questions to substantiate the credibility of other witnesses as far as a description is concerned. That is the jury's job and no one else's. That is my objection."

The state countered that the testimony in question was "being offered to establish the probable cause" for defendant's arrest—an issue which, according to the state, had been "opened" by defendant.[17] The trial justice agreed that Det. Melaragno should not be "vouching for another witness," but ruled that "he can say that * * * the appearance of the defendant was similar to the description he was given in the course of his investigation." The trial justice then explained: "That is why I overruled the objection, but I wouldn't let [Det. Melaragno] comment on the actual identification by the other woman."

Before this Court, defendant argues that the trial justice erred by allowing Det. Melaragno "to state his opinion that [defendant] fit the description provided by the eyewitnesses." The defendant calls "[t]he

---

**17.** The state argued that "[t]here's a very big issue in this case that was opened up by [defendant] with regard to the other occupant in this car, identity issues, description issues. [The testimony is] relevant because it establishes probable cause for the arrest."

prosecutor's probable cause reasoning"— *viz.*, that the testimony in question was being offered to establish the probable cause for defendant's arrest—"nonsense," and contends that "[t]his unfair bolstering of the witnesses' believability and shoring up of their identifications clearly invaded the jury's domain."

"[T]he determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury." *State v. Adefusika*, 989 A.2d 467, 476 (R.I. 2010) (quoting *State v. Haslam*, 663 A.2d 902, 905 (R.I.1995)). Accordingly, "bolstering," [18] "which occurs when one witness 'offer[s] an opinion regarding the truthfulness or accuracy of another witness'[s] testimony,' " is not permissible. *Id.* (quoting *State v. Webber*, 716 A.2d 738, 742 (R.I.1998)). We "will consider opinion testimony to be impermissible 'bolstering' * * * if 'the opinion testimony has the same substantive import as if it squarely addressed and bolstered another witness's credibility.' " *Id.* (quoting *State v. Miller*, 679 A.2d 867, 872 (R.I.1996)). In the event that we do deem certain testimony to be impermissible bolstering, we then must "determine whether the admission of the testimony constituted prejudicial error with respect to the defendant." *Id.*

The defendant, in support of his argument that Det. Melaragno's testimony constituted impermissible bolstering, again cites to *Nicoletti*. In *Nicoletti*, 471 A.2d at 614, the jury found the defendant guilty of having committed robbery and burglary with two other men. A police officer testified at the defendant's trial about the descriptions the complaining witnesses gave of the intruders on the night of the crime. *Id.* at 617. He testified that the witnesses'

original descriptions were "fairly close. The only problem would be maybe [the witnesses] may have made [the intruders] a little too tall, but other than that, [the witnesses were] pretty much on the money." *Id.* We reasoned in *Nicoletti* that such testimony from the police officer "concern[ed] his opinion of the description given by the complaining witnesses" and "was based on facts that the jurors could easily and independently have analyzed, after which they could have drawn their own conclusions." *Id.* We held in that case that the defendant was "unduly prejudiced" by the police officer's testimony "because the sole issue * * * was one of identification." *Id.*

Detective Melaragno's testimony differs from the police officer's testimony in *Nicoletti* in that, here, Det. Melaragno was not commenting on the accuracy of Ms. Lovett's or Ms. Matthews's identifications of the defendant, but rather on his own assessment of the defendant relative to the police-radio dispatches he received of his description. This vital distinction militates against a finding of bolstering because, rather than giving his opinion on the ability of another witness to describe the defendant accurately, he was asked to compare independently the physical description given in the dispatches with the actual appearance of the defendant, a task that is common to his responsibilities as a police officer. Accordingly, we hold that Det. Melaragno's testimony did not constitute impermissible bolstering.

## III

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior

---

18. The term "vouching" is sometimes used instead of, or along with, "bolstering." *See State v. Adefusika*, 989 A.2d 467, 476, 479 (R.I.2010); *State v. Higham*, 865 A.2d 1040, 1044, 1045, 1046 (R.I.2004). "While these terms are technically distinct, they are frequently used interchangeably, and it is unnecessary to expound upon the differences here." *State v. Rushlow*, 32 A.3d 892, 900 n. 7 (R.I. 2011).

Court in all respects. The record shall be remanded to the Superior Court.

Justice INDEGLIA did not participate.