**Supreme Court**

No. 2012-11-C.A.
(P1/09-2502A)

| | |
|---|---|
| State | : |
| v. | : |
| Emanuel Baptista. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                        :

v.                       :

Emanuel Baptista.        :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.** The defendant, Emanuel Baptista (defendant or Baptista), is before the Supreme Court on appeal from a judgment of conviction on two counts of first-degree child molestation[1] and two counts of first-degree child abuse on a child under the age of five.[2] The defendant argues that the trial justice erred in denying his motion for a new trial and that the verdict failed to do substantial justice between the parties. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

### Facts and Travel

The disturbing facts of this case concern the abuse and molestation of Anna,[3] an infant less than four months of age. Anna was born on April 8, 2009 to teenaged parents, Emanuel Baptista and Brenda. At the time of Anna's birth, the young parents shared an upstairs bedroom

---

[1] In violation of G.L. 1956 § 11-37-8.1 and § 11-37-8.2.

[2] In violation of G.L. 1956 § 11-9-5.3(b)(1), § 11-9-5.3(c)(2) and § 11-9-5.3(f).

[3] The infant has been given a pseudonym, and her immediate family—other than defendant—will be referred to by only their first names in order to protect the child's privacy.

in the Pawtucket home of Brenda's mother, Donna.[4]  In August 2009, Brenda was training to be a certified nursing assistant, which required her to work approximately two to three hours each morning.  Baptista, a certified electrical technician, was working as a cook in Foxboro, Massachusetts.  Donna cared for Anna when both parents were working; otherwise, Brenda and Baptista cared for their daughter.

On the morning of August 5, 2009, when she departed for work, Brenda left Anna with Baptista.  Brenda finished her scheduled shift and was running errands when she received a text message from Baptista, stating that Anna had choked on a baby wipe, but adding that she was fine.  Brenda immediately called Baptista to discuss the incident, and Baptista again assured Brenda that Anna was all right.  When Brenda returned home later that afternoon, Anna was sleeping.  The baby immediately began to cry when Brenda picked her up—behavior that the young mother testified was unusual.  Concerned that Baptista might have scratched or otherwise injured Anna's throat when retrieving the baby wipe, Brenda spoke with her mother and decided to bring the infant to Hasbro Children's Hospital.

Brenda and Baptista took Anna to the hospital's emergency room, where the infant was seen by both a resident and an attending physician.  Brenda told the doctors that Anna had choked on a wipe earlier that day and appeared out of sorts.  The doctors initially determined that Anna had a fever and proceeded to examine the child and discovered redness and exudates— secretions consistent with infection—at the back of Anna's throat.  The infant was tested for strep throat; however, the test result came back negative.  The doctors noted a small bruise on Anna's cheek, which they surmised was consistent with a baby of her age attempting to roll over.  The resident physician checked the infant's range of motion and also noted that there were no

---

[4] Brenda's older brother, Cory, and Donna's fiancé, Robert, also lived in the home at the time.

apparent bruises or areas of tenderness on Anna's extremities. Brenda also testified that, after she mentioned that she had seen a tiny spot of blood in the baby's diaper,[5] the resident physician briefly opened and closed Anna's diaper, seeing nothing amiss. Anna was diagnosed with a sore throat and sent home with a prescription for Tylenol. The resident physician also advised the young parents to follow up with Anna's pediatrician the next day, and he placed a call to the pediatrician's office suggesting that an attempt be made to locate the source of the infection that was causing the fever.

Brenda testified that she, Anna, and Baptista spent that night together and that she was never away from the baby. Brenda also testified that Anna slept through the night without incident. When Brenda left for work around 7 a.m. on the morning of August 6, 2009, she once again left Anna with Baptista. However, Baptista also had to work that day, and he brought the baby downstairs to Donna around 9 a.m. Donna testified that Anna seemed stiff and not herself that morning; the baby's lips were severely chapped and red. When Brenda returned home a few hours later, she observed that the infant was in distress. She called Anna's pediatrician and was given an appointment with a nurse practitioner for that afternoon.

Donna accompanied her daughter and Anna to the pediatrician's office, where they explained that the infant had choked on a baby wipe the previous day and was not acting normally. Brenda also expressed concern that the baby might have a blood disorder that would cause her to bruise easily, due to the numerous bruises she discovered in addition to the one on Anna's cheek. The nurse practitioner—who had received the phone call the previous night from the Hasbro emergency room—noted that initially, the baby was smiling and in no apparent

---

[5] Although Brenda testified to telling the doctors about the spot of blood she noticed in Anna's diaper before leaving for the hospital, the resident physician testified that he did not recall this comment and made no note that this had been said to him.

distress, and began the examination by trying to locate the source of the infection causing Anna's fever.

The nurse—assisted by an office assistant—attempted to insert a catheter in order to test for a urinary tract infection. This procedure required her to retract the infant's labia in order to insert the catheter, at which point a tear of the child's vagina—which was red and swollen—became apparent. The baby soon became uncooperative and the nurse was unable to complete the procedure. The nurse also noted bruises—in addition to the small bruise on Anna's cheek—on the baby's upper forearms and inner thighs, and abrasions around her mouth. The office assistant then asked Brenda, "What's going on at home?"—at which point the young mother became very upset. The nurse then explained to Brenda and Donna that she was required to report her findings to the Department for Children, Youth and Families (DCYF). Brenda and her mother were then asked to take Anna to a nearby lab to have blood work performed and to obtain the results of the urine sample from a small plastic collection bag that was placed in Anna's diaper.

Donna testified that she and Brenda took the infant to two different laboratories for the blood and urine tests and then returned home with the baby. Brenda then left for a short time in order to retrieve her cell phone from a repair store in Cranston. While she was out, an investigator from DCYF arrived at the house and asked that Donna take Anna to Hasbro Children's Hospital for another examination. Soon thereafter, Donna and Baptista, who had returned from work, took the infant to the hospital; Brenda met them at the hospital.

Doctor Carol Jenny (Dr. Jenny), the director of the Hasbro Child Protection Program, and Dr. Rachel Clinenpeel (Dr. Clinenpeel), a fellow in the program, examined Anna in the hospital emergency room. Doctor Jenny testified that she observed bruises and abrasions on Anna's face,

inside the infant's mouth and in her throat; as well as a complete rupture of the baby's frenulum—the tendon that connects the tongue to the mouth. Doctor Jenny testified that the injuries were caused by the forceful insertion of an object into the baby's mouth and that the injuries were recent—having occurred no more than three to five days prior. In addition, Dr. Jenny found significant bruising and inflammation of the baby's labia and vagina, as well as a significant laceration of the hymen which extended to the exterior skin. The doctor testified that the genital trauma was no more than a few days old.

Based on her findings, Dr. Jenny placed a seventy-two hour hold on the baby, and admitted Anna to the hospital. Brenda testified that she and her mother became hysterical upon hearing that the child would need to be held at the hospital for further testing, while Baptista sat silently, patting Brenda's back. Further testing at the hospital revealed that Anna had ten rib fractures that were less than three days old; a fracture of her upper right humerus—the long bone of the upper arm—that was healing; and a recent fracture of her upper left humerus that had not yet begun to heal. Doctor Jenny testified that the rib fractures were likely caused by forcible squeezing, noting that babies' ribs are flexible and do not break easily.

From the hospital, Brenda and Baptista were transported—in separate police cars—to the Pawtucket police station for questioning; Donna followed in her own car. Detective Richard LaForest (Det. LaForest) testified that after advising Baptista of his <u>Miranda</u> rights, he agreed to give a written statement. In his statement, defendant explained that Anna had choked on a baby wipe the day before and that, when he pulled the wipe from her mouth, it was bloody and the child vomited. The defendant further stated that when they brought the baby to the hospital on the evening of August 5, he thought he might have scratched Anna's throat when extracting the wipe.

Brenda and her mother consented to the request of Det. Jeffrey Allen (Det. Allen) to search the couple's bedroom. A cloth that appeared to have bloodstains on it was removed from the baby's diaper pail, along with other items including bed sheets, baby wipes, and infant pajamas. Some of the items were taken to the Department of Health Forensic Biology Laboratory for testing.[6] Anna's blood was found on the cloth and wipes; a small amount of DNA—from someone other than Anna and Baptista—also was detected.

The next day, Friday, August 7, 2009, the couple returned to the police station for further questioning. Detective Charles Devine (Det. Devine) testified that he reviewed the statements previously provided by Anna's parents and then spoke with Dr. Clinenpeel at the hospital. He again advised defendant of his constitutional rights and defendant signed and dated another rights form. Detective Devine and Det. LaForest then conducted an unrecorded interview of defendant. Detective Devine testified that he showed Baptista close-up photographs of the injuries to Anna's mouth and genitalia, and told him that according to the doctors, Anna's injuries could not have happened as he had described. Detective Devine testified that he then told Baptista he needed to tell the detectives what had happened to Anna because she could not speak for herself. According to Det. Devine, after several moments of silence, Baptista told them "I did it," and disclosed that he had inserted his finger into Anna's vagina, and that he had put his erect penis in the baby's mouth and ejaculated. Detective Devine testified that defendant stated that he then placed a wipe in the baby's mouth—which caused her to choke—and that he used a rag to clean the blood from her vaginal area.

After this unrecorded conversation, Det. Devine undertook a videotaped interview,

---

[6] For an unexplained reason, only some of the items seized from the home were actually tested for DNA. Notably, the pajamas that Anna was wearing at the alleged time of the sexual molestation were not tested, even though vomit or mucus stains were visible on the front of the garment.

during which defendant gave a similar statement while Det. Devine simultaneously typed what was being said. The defendant once again explained how he had sexually abused the infant and then inquired whether Anna would be released from the hospital. The video recording reveals that Det. Devine responded that it was customary for the hospital to hold the child for seventy-two hours, and that it was up to the hospital, DCYF, and the court system to decide where she would be placed after that. Detective Devine clarified that, although he could not state precisely where Anna would be placed, he assured defendant that "they make every effort to place the child with a biological relative * * * so you know every effort [is] going to be made to get her back to Brenda or Brenda's mother." The defendant's typed statement was then printed and read aloud to defendant. The defendant requested that two minor changes be made to the statement before he signed it. Shortly thereafter the police were informed that the X-rays revealed that Anna's ribs and arms also were fractured. Baptista was then questioned further and explained, in great detail, how he inflicted those injuries.

Baptista was arrested and subsequently charged by criminal indictment with four felony offenses: two counts of first-degree child molestation sexual assault, one by digital/vaginal penetration (count 1) and one by fellatio (count 2) in violation of G.L. 1956 § 11-37-8.1 and § 11-37-8.2, and two counts of first-degree child abuse on a child under the age of five relating to the infant's rib fractures (count 3) and arm fractures (count 4), in violation of G.L. 1956 § 11-9-5.3(b)(1), § 11-9-5.3(c)(2) and § 11-9-5.3(f).

A jury trial commenced on February 16, 2011, and continued over the course of six days. At trial, defendant did not challenge the admissibility of his statements to police,[7] and proceeded

---

[7] The record reflects that a motion to suppress the items seized and defendant's statements to police was filed with the Superior Court. However, although a suppression hearing concerning the seized items was held, there is no indication that the motion to suppress the statements made

to testify—in stark contrast to his confession—that Anna had choked on a baby wipe and that he was not responsible for the extensive injuries inflicted upon his daughter. The defendant also claimed that he had falsely confessed to harming Anna so that the infant would be allowed to return home rather than be placed in foster care. On March 2, 2011—after three full days of deliberation—the jury returned verdicts of guilty on all counts. The defendant's motion for a new trial was heard and denied by the trial justice; and, on May 16, 2011, Baptista was sentenced to concurrent life sentences on each count of child molestation. On counts 3 and 4, defendant received concurrent sentences of twenty years, ten to serve, with eight and one-half years to serve prior to eligibility for parole, to run consecutively to the sentences imposed on counts 1 and 2. Before this Court, defendant assigns error to the decision of the trial justice denying his motion for a new trial.

## Standard of Review

It is well established that when presented with a motion for a new trial, "the trial justice must determine 'whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt.'" State v. Staffier, 21 A.3d 287, 290 (R.I. 2011) (quoting State v. Peoples, 996 A.2d 660, 664 (R.I. 2010)). In doing so, "the trial justice acts as a thirteenth juror, exercising 'independent judgment on the credibility of witnesses and on the weight of the evidence.'" Id. (quoting State v. Heredia, 10 A.3d 443, 446 (R.I. 2010)). Specifically, this requires that "the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." State v. Paola, 59 A.3d 99, 104 (R.I. 2013) (quoting State v. Vargas, 21 A.3d 347, 354

---

to police was addressed.

(R.I. 2011)).

"If, after conducting such a review, the trial justice reaches the same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." Paola, 59 A.3d at 104 (quoting Heredia, 10 A.3d at 446). However, if the trial justice does not agree with the jury verdict, "he or she is required to proceed to a fourth step * * * to 'determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice.'" Staffier, 21 A.3d at 290-91 (quoting State v. Guerra, 12 A.3d 759, 765-66 (R.I. 2011)). "If the verdict meets this standard, then a new trial may be granted." Id. at 291 (quoting Guerra, 12 A.3d at 766).

"On appeal, this Court accords 'great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling.'" State v. Rosario, 35 A.3d 938, 947 (R.I. 2012) (quoting State v. Texieira, 944 A.2d 132, 140-41 (R.I. 2008)). A trial justice's determination will therefore be "left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." Paola, 59 A.3d at 104 (quoting State v. Smith, 39 A.3d 669, 673 (R.I. 2012)). This Court employs a "deferential standard of review because 'a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses.'" Id. (quoting Texieira, 944 A.2d at 141).

## Analysis

The defendant's sole challenge on appeal is to the decision of the trial justice denying his motion for a new trial; he argues that the trial justice overlooked and misconstrued material and relevant evidence. Specifically, defendant argues that the medical evidence conclusively established that when the emergency room doctors examined Anna on the evening of August 5, 2009, she had not been injured. The defendant contends that he therefore could not have

inflicted the injuries because he was never alone with the infant after that initial hospital visit. The defendant also argues that testimony presented at trial established that the bloody wipes, diapers, and clothes seized in the early morning hours of August 7, 2009 were not discovered until after the first visit to Hasbro and therefore were not present at the time when the state alleges the molestation occurred. Therefore, Baptista maintains, the trial justice overlooked the timing of Anna's injuries, as well as the fact that defendant's DNA was not found on the items tested, although a DNA profile of someone other than Anna or defendant was discovered. Lastly, defendant submits that, in denying his motion for a new trial, the trial justice's view was clouded by his false confession—which defendant claims to have given only to keep Anna from being placed in foster care.

We are cognizant that ruling on a motion for a new trial is a responsibility uniquely entrusted to the trial justice. Our careful review of the record in this case shows that the trial justice thoroughly evaluated and discussed the testimony and evidence presented and issued a comprehensive bench decision, setting forth her reasons for denying the motion for a new trial. In this case, the trial justice determined that the state had, in fact, proved beyond a reasonable doubt that the offenses charged were committed against Anna and that the state had also proven beyond a reasonable doubt that it was defendant who perpetrated those crimes against his infant daughter.

Concerning the timing of the injuries, the trial justice observed that on August 5, 2009, Anna was presented at the emergency room with the story—concocted by defendant—that the infant had choked on a baby wipe. The doctors proceeded to examine the child for injuries consistent with this account. Anna's throat was red and she had a temperature. The doctors briefly opened her diaper to determine if a rash was causing her fever; however, seeing no rash,

the doctors closed her diaper, and no further examination of her genital area was conducted. The trial justice noted that the extent of the examination on August 5 was limited and unremarkable, but that the doctor who examined the infant not only requested that her parents follow up with Anna's pediatrician, he placed a call to the pediatrician's office.

The trial justice also deemed highly credible the testimony of the pediatric nurse who examined Anna on August 6, 2009. That testimony established that bruises on the baby's arms and thighs were apparent the very next day after the initial visit to the emergency room. Then, in searching for the source of Anna's fever, the nurse discovered external injuries to Anna's vagina and—for the first time—the possibility that the infant had suffered some type of physical abuse arose.

Finally, the trial justice noted that Dr. Jenny's comprehensive examination of Anna was specifically undertaken to search for signs of abuse. It was during this examination that Anna's broken bones were discovered after a full body X-ray scan; also discovered then was the fact that her hymen was torn and that there was a complete rupture of the tiny tendon beneath the infant's tongue. The trial justice rejected defendant's contention that, because the full extent of Anna's injuries was not found until Dr. Jenny's examination, those injuries were somehow inflicted overnight, after the first visit to Hasbro. The trial justice drew the reasonable inference that the injuries Anna sustained "became more visible with time," and she found Dr. Jenny's testimony concerning the age of the injuries and an infant's normal healing rate to be highly credible.

The trial justice also specified that "the absence of DNA evidence linking defendant to the crimes did not negate the other evidence identifying him as the perpetrator." The trial justice recounted the testimony that seminal fluid would not have remained in the infant's mouth or throat for any significant amount of time, and therefore, it was inconsequential that semen was

not discovered. The trial justice also concluded that the presence of a minor unidentified DNA profile was not significant, noting that the jury reasonably accepted the testimony that this DNA was inconclusive and could easily have been transferred from another item located near the source. The trial justice found that there was no scientific evidence reasonably suggesting another perpetrator, nor was there "one iota of evidence" that anyone other than defendant, Brenda, or Donna was ever alone with Anna.

Finally, the trial justice found defendant's version of events "outlandish" in light of the other testimony and evidence presented in the case. The trial justice observed that defendant's testimony did not appear credible and that his demeanor was detached. The trial justice discounted the claim that he falsely confessed, and recounted that, throughout the videotaped confession, defendant was told that the child would be held temporarily and that it would then be up to the hospital, DCYF, and the courts to determine her placement; there was never a suggestion that the child would be mistreated or kept in foster care. The trial justice found it especially inconceivable that, while not disputing that someone had brutally raped and broken the bones of his infant daughter, defendant claims to have confessed so that Anna could be returned to the home where it could happen again by some unknown perpetrator. Although the trial justice noted the "powerful evidence of the defendant's confession," she also identified the presence of the baby's blood on the items tested as corroborative proof. Moreover, defendant's videotaped confession showed that, when the detectives learned about Anna's broken bones, defendant described how he had inflicted those injuries in a detailed manner, demonstrating personal knowledge and not speculation. After careful review of the record, we are satisfied that the trial justice articulated sufficient reasoning for reaching the same conclusion as the jury and denying defendant's motion for a new trial.

The defendant further argues that the trial justice erred by denying his motion for a new trial because the verdict was against the fair preponderance of the evidence and failed to do substantial justice between the parties. We deem this argument misplaced. It is only when a trial justice disagrees with the jury's verdict that he or she must proceed to the fourth step of the new trial analysis and examine the verdict for substantial justice. Staffier, 21 A.3d at 290-91 (citing Guerra, 12 A.3d at 765-66).

Here, the trial justice reviewed the evidence and noted that the jury verdict was supported by the evidence adduced at trial. The trial justice also thoroughly addressed the issues raised by the defendant on appeal. Accordingly, we are satisfied that the trial justice conducted the appropriate analysis and reached the same result as the jury after considering the evidence presented in light of the jury charge and independently assessing the credibility of the witnesses and the weight of the evidence. The trial justice determined that sufficient evidence was presented for the jury to find the defendant guilty on all counts charged. She then articulated an acceptable rationale for denying the defendant's motion. Thus, having neither misconceived nor overlooked material evidence, when the trial justice determined that she agreed with the jury's verdict, this inquiry properly concluded.

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment of conviction. The papers in this case may be remanded to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**      State v. Emanuel Baptista.

**CASE NO:**      No. 2012-11-C.A.
                            (P1/09-2502)

**COURT:**      Supreme Court

**DATE OPINION FILED:**   November 18, 2013

**JUSTICES:**      Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**      Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**   Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                            Associate Justice Netti C. Vogel

**ATTORNEYS ON APPEAL:**

                            For State:   Virginia M. McGinn
                                                Department of Attorney General

                            For Defendant:  Janice M. Weisfeld
                                                    Office of the Public Defender